Blythewood, Inc., a Connecticut corporation and defendant herein, is a private sanitarium located in Greenwich, specializing in the treatment of mental and nervous disorders. During the summer of 1941 four medical men were on its staff and in addition over 100 men and women comprised its corps of employees, including nurses. In a manner of speaking, defendant was and is, engaged in the treatment of mental cases, for a consideration, on a somewhat substantial scale. *Page 200 
In July, 1941, defendant through its duly authorized agent (Dr. Harry M. Tiebout) wrote to The Medical Bureau of Chicago as follows: "We have a vacancy on our resident staff for a physician and I am writing to inquire if you have any candidate who may be suitable for consideration. The position is a full-time one and involves the routine care and treatment of patients in a private psychiatric hospital. The man is allowed alternate nights, every other week-end and one full day a week. The salary is $2,400 a year plus full maintenance. If the man is married, maintenance for his wife will be included. For an exceptionally desirable candidate, the salary may be somewhat higher. We prefer a man with a Connecticut license or one who would be able to secure it shortly after accepting. His personality should be such that he is acceptable to patients of good cultural and educational background."
In July, 1941, plaintiff, a native of Poland, was a resident of New York City. By letter dated July 25, 1941, the bureau brought to plaintiff's attention the aforesaid advertisement. Plaintiff in due course answered the advertisement and in the first week of August secured an interview at Blythewood with Mrs. A. C. Wiley, its president and treasurer.
Mrs. Wiley was and is in charge of the business affairs of defendant. Her primary purpose in interviewing a candidate for employment at the institution is to "size him up", to ascertain his "spiritual qualities" and "habits of life." The medical qualifications of a candidate such as plaintiff are left by the lady to her able, efficient and veteran assistants and senior staff members — Dr. Tiebout and Dr. Vessie.
At the August, 1941, interview, Mrs. Wiley was satisfied that plaintiff possessed those attributes of character and bearing which constitute a gentleman. On the intellectual aspect plaintiff showed Mrs. Wiley and Dr. Vessie samples of his writings in the medical field and left them at the institution for further examination by others. So also, he was able to give, and did give, references as to his character and abilities. It is sufficient to say that these references were later checked upon by defendant, acting through its duly authorized agents, and were found to be of the best.
It appears that plaintiff was educated in European institutions of learning. His medical education and background are extensive to say the least. In August, 1941, he did not hold a *Page 201 
license to practice medicine in Connecticut or elsewhere in the United States. This fact was made clear to defendant, and its duly authorized agents, but was not deemed by them (at least up to and including October 2, 1941) as an obstacle to his employment. Dr. Cleaver, whose position plaintiff was being considered for, had not possessed a Connecticut license when he first entered defendant's employ and only became a licensed physician in Connecticut subsequent thereto and a short time before August, 1941. On this aspect the court expressly finds that plaintiff's attainments were such that he could have passed the Connecticut examination in due course; that his proposed duties did not in themselves require a license; and that his willingness to take the Connecticut examination for a license in due course, made known to Mrs. Wiley and her assistants, resulted in an express waiver by them, acting on behalf of defendant,de the then lack of a Connecticut license. See, also, defendant's letter and advertisement directed to The Medical Bureau of Chicago (second paragraph of this memorandum),supra.
During the August interview with Mrs. Wiley, the salary aspect was discussed. It was to be $2,400 for the period of one year. The position for which plaintiff was being considered was the vacancy to be created by Dr. Cleaver entering the Army in the late summer or early autumn of 1941. At the time of the August interview it was not definitely known when Dr. Cleaver would be called up. Neither had plaintiff's references been checked. In short, no contract of employment was entered into on that day although Mrs. Wiley was personally satisfied with the result of the interview.
During the last week of September, 1941, plaintiff talked on the telephone with Dr. Vessie. He was told that Dr. Cleaver had been called into the Army and that it was in order for him, plaintiff, to proceed to Blythewood. In that telephone conversation, plaintiff was told that the position was his "for one year."
On October 2, 1941, plaintiff reported at the institution. On the evening of said day final arrangements were made, and agreed upon, between plaintiff and Dr. Tiebout. These included accommodations for plaintiff and his wife de living quarters, maintenance and laundry.
The court expressly finds: *Page 202 
1. That on the evening of October 2, 1941, an oral contract of employment was definitely entered into between plaintiff and defendant de plaintiff's employment for the period of one year at a salary of $2,400.
2. That conversations and correspondence between the parties prior to October 2, 1941, were preliminary matters.
3. That the contract of employment for the period of one year, in addition to the salary of $2,400, included living quarters, maintenance and laundry for plaintiff and his wife.
4. That Dr. Tiebout was a duly authorized agent of defendant and acting in such capacity entered into the aforesaid employment contract with plaintiff on said October 2, 1941.
5. That at all times relevant to the issues in this case, Mrs. Wiley, Dr. Tiebout and Dr. Vessie acted on behalf of defendant corporation in everything they did and said; all of them were given to the use of the editorial "we" in their respective testimony; to all intent and purposes Mrs. Wiley personally was the corporation with Tiebout and Vessie occupying roles of mediums and advisers.
6. That on the evening of October 2, 1941, plaintiff entered upon his duties pursuant to said contract.
7. That the fact that plaintiff at said time was not a duly licensed physician in Connecticut had not been a condition precedent to the contract and was not made a condition subsequent thereto; the duties that he was to perform under said contract, and in fact commenced to perform, did not require a license any more than a license was required of Dr. Cleaver when he commenced his employment with defendant.
8. That the services plaintiff performed under said contract until breach thereof by defendant were eminently satisfactory.
9. That on October 7, 1941, plaintiff was discharged by defendant.
10. That the reason why plaintiff was discharged was because Dr. Cleaver had been rejected by the United States Army for physical reasons and was again available for civilian employment; Mrs. Wiley, Dr. Tiebout and Dr. Vessie — but primarily Mrs. Wiley, the leader of the triumvirate — willed it thus, that is to say, wanted Cleaver back in place of plaintiff.
11. There was no implied provision or condition in the contract *Page 203 
of October 2, 1941, that plaintiff's employment for one year was contingent upon Dr. Cleaver remaining in the Army for at least that period of time.
12. The contract of the employment of October 2, 1941, was a straight one year contract on the basis of the salary and living accommodations hereinbefore specified; the only implied term to which it was susceptible is the usual term implied by law that the service of the employee be reasonably satisfactory;they were!
Additional subordinate facts could be readily added to the foregoing, but are not required for the purposes of this memorandum. It is sufficient to say that the subordinate facts herein set forth are not intended to comprise, in whole or in part, such subordinate facts as will be contained in a formal finding in the event of an appeal to the Supreme Court of Errors.
All of defendant's claims of law and of fact are overruled. For this court to hold that the nature of plaintiff's employment was on a day to day basis or an hour to hour basis, or that the Statute of Frauds nullifies plaintiff's claim for damages, or that the lack of a Connecticut license made useless the work plaintiff was to do in spite of his research abilities and brilliant background (to list but a few of defendant's extraordinary claims), would violate all reason and every elementary principle of law.
The court now comes to the question of damages.
The action was returned to court on the first Tuesday of March, 1942, claiming damages in the amount of $2,000. Pleadings were thereafter closed and the case went to trial at the Stamford session of court on May 7, 1942.
In Viall vs. Lionel Mfg. Co., 90 Conn. 694, 700, the Connecticut rule de damages is stated thus: "The employee or contractee, immediately upon breach of contract, can sue and recover damages for the entire term, or he can wait until the end of the term; in either case his action is for breach of the contract: he has no action for wages or salary for service rendered subsequent to the breach." (Citing Perry vs. SimpsonWaterproof Mfg. Co., 37 Conn. 520; Grant vs. New DepartureMfg. Co., 85 id. 421.) In addition, see 5 Williston, Contracts
(Rev. ed. 1937) § 1362 and quotation therein from Cutter *Page 204 vs. Gillette, 163 Mass. 95, 97, 39 N.E. 1010 (cited in Viall
case, supra).
Damages may be mitigated, but the burden in this respect is upon the defendant. "Upon proof of defendant's breach of his contract of employment, the plaintiff was prima facie entitled to recover the amount of his salary for the balance of the year, and was not bound to offer evidence that he had sought other employment. The burden was upon the defendant to prove that the plaintiff could by proper diligence have found other employment, if such was claimed to be the fact." Krawitzvs. Ganzke, 114 Conn. 662, 665, citing the Grant case,supra, p. 426, and Pollak vs. Danbury Mfg. Co., 103 Conn. 553,559. See, also, Safford vs. Morris Metal Products Co.,97 Conn. 650, 656.
Defendant offered no affirmative evidence to prove that by proper diligence plaintiff could have found other employment between October 7, 1941 (date of discharge) and May 7, 1942 (date of trial). In any event the court expressly finds that such employment was not available to plaintiff, a foreigner; that under the circumstances he exercised the requisite diligence. For the purposes of this case the controlling period is treated as a period of seven full months (October 7, 1941 to May 7, 1942) amounting to $1,400 in wages under the contract of employment.
In addition, plaintiff is entitled to a further award for maintenance for himself and wife per agreement. Plaintiff was to give up his New York City apartment and bring his wife to Blythewood. He had made arrangements to do this but his discharge on October 7, 1941, brought this undertaking to an end. Dr. Tiebout, on cross-examination, stated that he believed an allowance of $700 a year was made for a single man at a similar institution and that he considered this a reasonable and customary allowance. It would seem, therefore, that $1,000 a year for a man and his wife would constitute a reasonable estimate of value de allowance under the circumstances of this case. This would amount to a breakdown of $83.33 a month. On the basis of a seven months' calculation (October 7, 1941 to May 7, 1942) the total allowance award in this connection amounts to $583.31.
The court does not attempt to allow damages beyond May 7, 1942 (date of trial). The amount of the ad damnum *Page 205 
($2,000) and the belief that plaintiff, who now holds a New York license, can provide employment for himself at this time enters into this aspect of the case.
The court finds that the sum of $50 given plaintiff by defendant on October 8, 1941, when he was returning to New York City, was intended by the latter, and accepted by the former, as reimbursement for services rendered between October 2, 1941, and October 7, 1941, and for certain miscellaneous expenses such as train fare. payment and acceptance thereof, under the circumstances, has not affected the issues in the case. Accordingly, no deduction is allowed for the same from the $1,400 item de wages from October 7, 1941, to May 7, 1942.
 Accordingly, judgment will enter for plaintiff to recover of defendant damages in the amount of ($1,400 plus $583.31) $1,983.31.
In conclusion the court wishes to thank all counsel for their able preparation of the case and for their well considered briefs.